**Saul OLZMAN et al., Appellants,**

v.

**LAKE HILLS SWIM CLUB, INC.,**
**Appellee.**

**No. 427, Docket 73–1626.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1974.

Decided April 19, 1974.

Michael N. Pollet, New York City (Marvin M. Karpatkin, New York City; Harvey A. Silverglate, Boston, Mass.; Nancy Gertner, Boston, Mass., of counsel; Karpatkin, Ohrenstein & Karpatkin, New York City, and Zalkind & Silverglate, Boston, Mass., on the brief), for appellants.*

* Brief of amicus curiae urging reversal was filed by Richard F. Bellman, Suburban Action Institute, Tarrytown, N.Y. (J. Christopher Jensen, on the brief).

James L. Goldwater, New York City (Goldwater & Flynn, New York City), for appellee.

Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from the grant of summary judgment against plaintiffs who allege racially discriminatory operation of a swimming club. The appellants include members of the Lake Hills Swim Club, Inc. (the club), as well as representatives of a group of black children from Roslyn, Long Island, New York, who were invited by those members to use the facilities of the defendant club as guests of the plaintiff members. The action was brought in August, 1969, but was not decided by the court below until February 15, 1973. The appeal did not reach us for about a year and thus we are to consider the serious questions involved some five years after the event on the basis solely of affidavits submitted and available to the court below. The suit claims violation of the thirteenth and fourteenth amendments to the United States Constitution, Title 2 of the Civil Rights Act of 1964, 42 U.S. C. § 2000a et seq. and 42 U.S.C. §§ 1981, 1982. For reasons that will appear, not the least of which is the Supreme Court's decision in Tillman v. Wheaton-Haven Recreation Association, Inc., 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), made shortly after the decision below, we reverse and remand for further findings. The non-summary "summary judgment" of the court below theretofore is reversed.

The defendant club was incorporated in April, 1960, under the Membership Corporations Law of New York (repealed in 1970 and replaced with the Not-for-Profit Corporation Law, McKinney's Consol. Laws, c. 35) to operate a private, non-profit swimming pool with associated facilities and amenities for the use of members living in the

community known as Lakeville Estates Park in East Hills, New York. At the time of this formation, Lakeville Estates was under development and was one of several developments in the incorporated Village of East Hills. In December, 1960, at the request of persons interested in the club, the Village of East Hills adopted an ordinance amending its zoning law to provide that a building and lot of land could under certain conditions be used for a swimming pool and accessory purposes "by an association or membership corporation (all directors, officers, and members of which shall be resident owners of real property within the Village) and which is not conducted for profit or gain . . . ." The ordinance provided that any permit granted under it to a club could "prescribe reasonable rules and regulations for the operation, maintenance and use of such swimming pool and any accessory structures." In February, 1961, the board of trustees of the Village, after making certain findings, granted a temporary permit to the defendant club conditional on several bases, including the requirement that the membership be limited to 100 bona fide residents of the incorporated Village of East Hills.[1] The club acquired pool property which includes a swimming pool, a parking area, related wading pool and bathhouse, with a little snack bar at which snacks and soft drinks can be obtained and which operates at a loss. The club has no liquor license and does not serve meals. All of the members do come from East Hills, and all but a few of them from Lakeville Estates. Under the club bylaws, acquiring membership requires the payment of $2,000 and withdrawal from membership involves a partial loss of the membership investment, even though a new member paying the full fee acquires the retiring member's membership. The bylaws also permit members who sell their residences to transfer their certificates of membership to the new owners without the necessity of approval by the

---

1. In June, 1962, the permit was amended, however, to provide that the club could accept membership to the extent of 110 such

residents of the village, though it appears that there were in fact only 100 members at the time of decision below.

board of directors, that transfer automatically taking precedence over the waiting list of the time.

## I.

The first question is whether the club is genuinely private within the meaning of 42 U.S.C. § 2000a(e) [2] so as to exempt it from the operation of § 2000a(a).[3] Cf. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969). The district court found the club to be private. The decision of this question is important not only as to the effect of § 2000a(a) but perhaps in respect to the effect of §§ 1981 and 1982. See Tillman v. Wheaton-Haven Recreation Association, 410 U.S. at 438–439, 93 S.Ct. 1090. The facts in Tillman and Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), which denied "private club" status to the swimming pool and park therein, closely parallel those here. In each case membership was generally restricted to persons living within a particular geographic area;[4] in Tillman there was a stated maximum number of memberships;[5] and in each case there was a requirement of formal board or membership approval.[6] Indeed, here there is not even any approval requirement with regard to applicants who have bought houses belonging to former members.[7] These applicants automatically become members upon paying their membership fees without ever having to progress through the waiting list. In short, here "there was no plan or purpose of exclusiveness." Sullivan v. Little Hunting Park, 396 U.S. at 236, 90 S. Ct. at 404.

■ Appellee argues that because the club is open only to 110 residents and their families out of 2,300-odd homeowners in the community of East Hills, it is not open to the general public and hence should fall within the exemption of § 2000a(e). The same argument failed in Tillman, as it must have; if limitation on the number of users were the test, every restaurant or night club limited by law or fire regulations to a given number of occupants at a given time would be magically transformed into a "private club." Accordingly, we have no difficulty in following the lead of Tillman and Sullivan and finding that the Lake Hills Swim Club, Inc., is not a "private club" within the meaning of § 2000a(e), and therefore is not exempt from the prohibitions of § 2000a et seq., as well as the broad sweep of §§ 1981 and 1982.

## II.

Having determined that plaintiffs' claim is not foreclosed by 42 U.S.C. § 2000a(e), we turn to their claims under 42 U.S.C. §§ 1981 and 1982 [8] and 2000a.

2. The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section.

3. All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

4. Membership in the Lake Hills Swim Club, Inc., is restricted to residents of East Hills both by virtue of its own bylaws, the conditional use permit under which the club oper-

ates, and the zoning ordinance under which the permit was issued.

5. Membership in the club is restricted by the conditional use permit to 110 bona fide residents of East Hills, while the bylaws apparently restrict membership to 100 members only.

6. A Membership Committee is chosen by the board of directors of the Lake Hills Swim Club, Inc., from members of the club outside the board to consider applications and to recommend to the board acceptable applicants. There is no indication that any applicant has ever been rejected.

7. Article VI, Section 7, of the Bylaws of the Lake Hills Swim Club, Inc.

8. 42 U.S.C. §§ 1981 and 1982 are traceable to the Civil Rights Act of April 9, 1866, ch.

Here appellee argues that the club's adoption of the amended guest rules violated no rights protected by §§ 1981 and 1982; that persons not residing in East Hills have no standing to sue and plaintiff Olzman lacks standing because he has since moved away; and that in any case there was no showing in the record of discrimination on the basis of race. To understand these arguments it is necessary to set forth the controversy in greater detail.

All the plaintiffs are present or, in the case of Olzman, former members of the club except plaintiffs Terry and Hilton. Plaintiff Terry is pastor of a Baptist church in Roslyn Heights, and his congregation includes the black children who have been barred from using the club's pool under the circumstances hereinafter set forth. Plaintiff Hilton is a parent of some of the Roslyn children who have been prevented from the use of the pool as guests of club members.

The dispute began early in June, 1968. As might be expected, the affidavits are not consistent, but apparently plaintiff Olzman invited a business associate to bring a group of black children to the pool on a Saturday. This plan apparently bore no fruit but later attempts to invite black underprivileged children from nearby Roslyn through the Rev. Mr. Terry were more successful. Apparently after the first "day the children were brought in" a meeting of the executive board discussed how to deal with the problem of underprivileged children as guests.[9] The focus of discussion was how to keep the underprivileged children out, and there were numerous suggestions. One person suggested that all guest privileges be eliminated. Another suggested that underprivileged children and adults not be admitted as guests. It was asked why these children did not go somewhere else. Later it would be suggested that the club pay for the children to be taken somewhere else, so as to keep them from using the pool. There was a motion to redefine "guest" as a relative or friend of a member and to exclude individuals or groups from public or private charitable or benevolent organizations "without regard to race, color or creed." This motion was carried. Some, however, suggested that there was a possibility for compromise between what were fast becoming entrenched opposition groups. And, indeed, compromise was reached. Those wishing to bring the underprivileged children in as guests would be allowed to do so each Monday morning during this one summer, Monday being the day when the pool was least used, but this would be the only day of the week they could do so. This "arrangement" brought a measure of quiet to the club which was being rent apart by this dispute. As the court below put it, the meetings and exchanges, "in which everyone put forward his worst foot, . . . were full of recriminations, rich in objurgative expression on both sides and replete with competing claims of 'liberalism' and 'private club.' " In less euphemistic terms, one side claimed that the other was expressing an intent to keep the "nigger kids" out, while the other side hotly denied any such thing.

In any case, the dispute was at least put off by the "arrangement." During the summer of 1968 at the pool, all went

---

31, § 1, 14 Stat. 27, which was reenacted by the Civil Rights Act of May 31, 1870, § 16, 16 Stat. 144. *See* Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 439-440 n.11, 93 S.Ct. 1090 (1973).

9. Under the guest rules then in effect members were allowed to bring up to two guests a day before July 1 and after August 23, and no more than four guests a day between those dates. The plaintiffs, by pooling their guest privileges, were thus able to bring more than enough children to the pool. Moreover, there was evidence that it was common practice for a member to utilize another member's guest privileges in addition to his own in order to bring in more guests than he would be allowed alone. There was a $2.00 fee per guest per day on the weekdays, except that between July 2 and August 22 Tuesdays and Wednesdays were free guest days. Guests were required to be accompanied by a member and the member bringing the guest was responsible for him.

smoothly, and the presence of black children on Monday mornings apparently went without incident, if not without comment, either on the part of the guests, the children of members or the members themselves.

Subsequently, however, a committee was formed to make revisions in the bylaws generally. This committee divided into a majority group which wished to vest the power to make rules concerning guests in the board, and a minority group which wished to provide in the bylaws that members could invite guests of their own choosing. The majority carried the day, and the bylaws vesting the power in the board were adopted on March 24, 1969. The directors established a Rules and Regulations committee which drafted a new set of guest rules which were in turn adopted by the board on May 12, 1969. There were a number of changes in the guest rules, but most striking was the addition of three new sections—as the first three sections of the rule—which have the effect of denying the plaintiff members from inviting underprivileged children to the pool as they had done the year before under the then existing rules. The first change was to define "guest" as being limited to a friend or relative of a member. Next, it was stated that no member would be entitled to "include among his guests any group or groups of persons in concern and in conjunction with other members . . ." without permission from the board. Finally, no individual was allowed to be a guest more than twice in a season.

More or less contemporaneously, Camp Unity, apparently the formal name attached to the group from which the black children had been invited, applied to the board for permission to use the pool on a once weekly basis during the six week period from June 30 to August 8. The pool was sought for the hours of 10 to 12 in the morning for about 15 children and five counselors. The board discussed Camp Unity's request and then voted on it, nine of the 11 members voting to deny the request. At a general membership meeting several members attempted to have a vote taken by the membership regarding Camp Unity's request, although it was acknowledged that such a vote would be only advisory to the board. Finally on July 21, 1969, plaintiff Olzman requested permission of the board to bring ten black children from Roslyn to the club on Thursday, July 24, indicating that his request was not an isolated act but was intended to become a continuing practice. The board after advice from counsel offered to allow the use of the club on two Mondays, July 28 and August 11, to Olzman and his associates. Olzman never replied to this offer, but instead began this action shortly thereafter.

From these facts essentially two questions emerge: (1) whether a prohibition against bringing black guests to a pool club involves any rights protected by §§ 1981, 1982 and 2000a et seq.;[10] (2) if it does, whether the rule changes made by the Lake Hills Swim Club, Inc., violate any of those rights by discriminating against black persons.[11] In order to an-

10. It should be sufficient to note that implicit in the Supreme Court's statement in *Tillman,* 410 U.S. at 440, 93 S.Ct. at 1095 (footnote omitted), that "[o]n remand the District Court will develop any necessary facts concerning the · adoption of the guest policy and will evaluate the claims of the parties free of the misconception that Wheaton-Haven is exempt from §§ 1981, 1982 and 2000a," is an indication that a discriminatory guest policy can be a deprivation of rights protected by those sections.

11. On the question of standing, it is enough to say that the plaintiffs who are present

members have standing as did the Tillmans on behalf of their guest, Mrs. Rosner, 410 U.S. at 439, 93 S.Ct. 1090 or as did Sullivan "as an effective adversary" on behalf of his tenant, Freeman, in *Sullivan,* 396 U.S. at 237, 90 S.Ct. 400, 24 L.Ed.2d 386. *See also* Barrows v. Jackson, 346 U.S. 249, 257–260, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) ; Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex. 1969). Inasmuch as this is an action for an injunction, it is unnecessary to determine whether the Rev. Mr. Terry, Mrs. Hilton or Mr. Olzman also have standing.

swer the first question, we must accept plaintiffs' claims as alleged.

■■■ Section 1982 provides that all citizens shall have the same right as white citizens "to inherit, purchase, lease, sell, hold, and convey real and personal property." While the condition of being a guest is not normally considered a "property" right one can "hold," there is authority and justification for considering it such under § 1982. As the Supreme Court stated in the pivotal case of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 432, 88 S.Ct. 2186, 2199, 20 L.Ed.2d 1189 (1968), one of the "great fundamental rights" sought to be preserved by the Civil Rights Act of 1866 was "the right to go and come at pleasure. . . ." It is reasonable to characterize the freedom of blacks to go and come as guests of a swim club member as sufficiently pertaining to a condition of property to be a right capable of being held under § 1982. Upon being invited by a member of the club, a black child becomes an invitee of that member with certain rights pursuant thereto. Walker v. Pointer, 304 F.Supp. 56, 62 (N.D.Tex.1969). Whether these rights are denominated licenses, easements or usufructs, the guest has an interest in his guest status which the law may protect from certain invasions. Cf. Terry v. Elmwood Cemetery, 307 F.Supp. 369, 373–74 (N.D.Ala. 1969). Thus, if during 1968, while the black children were guests in accordance with the guest rules, the club had forcibly ejected them, the children's right to be guests and to exercise the rights pursuant thereto would be "property" held by them sufficient to be protected by § 1982. While this did not occur here, what is alleged is closely analogous. Here plaintiffs allege that the rule change was a direct result of the black children being invited as guests and of their acceptance of that invitation. As such, the allegation states a cause of action under § 1982, because so to change the guest rules would be to penalize the black guests for exercising their "property" rights, thereby violating § 1982.

■ Section 1981 provides that "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." This has been interpreted to require swimming pool owners and operators to sell tickets of admission to blacks. Valle v. Stengel, 176 F.2d 697 (3d Cir. 1949); Williams v. Kansas City, 104 F.Supp. 848 (W.D.Mo.1952), aff'd, 205 F.2d 47 (8th Cir.), cert. denied, 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (1953). See also Scott v. Young, 421 F.2d 143, 145 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L. Ed.2d 91 (1970). Here entry to the pool is not obtained simply by payment of a fee as was the case in the above cases. Nevertheless, under the 1968 guest rules, once the guest was invited and accompanied by a member and met the requirements of not being a resident of East Hills, admission then was conditioned only upon payment of a fee (except on the free days, which were not utilized by the black guests or their white hosts). This entry conditioned on payment of a fee thereby became a contract between the guest and the club (or between the member and the club to which the black guest would be a third-party beneficiary, able to enforce the contract). Scott v. Young, 421 F.2d at 145. To change the guest rules so as to exclude black guests would at the same time prevent them from making these contracts, if not penalize them for having made them in the past. This would constitute a violation of § 1981.

To be sure, there is an overlap of §§ 1981 and 1982, and *Tillman, supra,* as we have said, note 10 *supra,* while not discussing these points directly, nevertheless gives some indication that they do provide protection for black guests, as would be expected from statutes enacted for the purpose of eliminating the "badges and incidents" of slavery, *see* The Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883); The Slaughterhouse Cases, 83 U.S. (16 Wall.)

36, 71–72, 21 L.Ed. 394 (1873). We are obliged not to forget the broad and sweeping nature of the protection meant to be afforded by these statutes. Sullivan v. Little Hunting Park, 396 U.S. at 237, 90 S.Ct. 400, 4 L.Ed.2d 386.

Section 2000a(a) states that

All persons shall be entitled to the full and equal enjoyment of the . . . facilities, privileges, advantages . . . of any place of public accommodation, as defined in this section, without discrimination . . . on the ground of race. . . .

Thus, if the Lake Hills Swim Club, Inc., is a "public accommodation, as defined in this section," a rule prohibiting guests on the basis of race would be prohibited by § 2000a(a). We have already discussed the § 2000a(e) exemption for private clubs, and why it does not apply here. Daniel v. Paul, *supra,* indicated that swimming pools may qualify as places of entertainment within the meaning of § 2000a(b)(3). The only other requirement to bring the Lake Hills club within the meaning of a public accommodation is that its operations "affect commerce." While the record is not as complete as we might wish, a number of factors suggest that the club's operations may well affect commerce.[12] We note reference to club luncheons (to which guests may be invited) and club movie nights. *See* Twitty v. Vogue Theatre Corp., 242 F.Supp. 281, 287–288 (M.D.Fla.1965). Both of these activities presumably would involve goods traveling in interstate commerce. The snack bar operated on the club's premises also presumably serves food which travels in interstate commerce. *See* 42 U.S.C. §§ 2000a(b)(2), 2000a(c)(2). *Cf.* Lehrman v. Gulf Oil Corp., 464 F.2d 26, 35 (5th Cir.), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). Such activities and facilities are sufficient to bring the entire club within the broad scope affecting interstate commerce. § 2000a(b)(4). While the overall effect of Lake Hills Swim Club, Inc., on interstate commerce may be minuscule, this would not remove it from the coverage of the statute; when taken together with other clubs and pools and snack bars similarly situated the effect is no longer so trivial. Katzenbach v. McClung, 379 U.S. 294, 300–301, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wooten v. Moore, 400 F.2d 239 (4th Cir. 1968), cert. denied, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969).

The above discussion goes to establish only the answer to the first question, whether §§ 1981, 1982 and 2000a protect black guests from racially discriminatory guest rules at the Lake Hills Swim Club, Inc. It does not answer the question whether the rules actually adopted in 1969 were racially discriminatory. Nor is that a question this court can answer merely on the affidvits and record before it.

The court below found that nothing in the formal structure of the club bylaws or rules and regulations was discriminatory on its face. Accepting that as true arguendo, however, we are far short of the analysis we are called upon to make by a number of cases. *Cf.* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1972) (Title VII); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), modified on other grounds,

---

12. It is not to be supposed that Congress in enacting a law to eliminate racial discrimination in public accommodations would have intended a narrow interpretation of "affecting commerce." Rather we may view that intent as embracing a broad, liberal construction that would reach the constitutional limits of the commerce clause. *Accord,* Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 351–353 (5th Cir. 1968) (en banc). A number of courts have gone quite far in finding operations affecting commerce under § 2000a. *See, e. g.,* Scott v. Young, 421 F. 2d 143 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820 (1970) (canoes and umbrellas were purchased out of state); United States v. Deetjen, 356 F.Supp. 688 (S.D.Fla.1973) (piano, juke box, color television and alcohol at bar all originated out of state); United States v. Vizena, 342 F.Supp. 553 (W.D.La. 1972) (amusement devices in bar originated out of state).

452 F.2d 327 (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (Section 1981). Here one of the major changes in the rules was the definition of a guest as a friend or relative of a member. As in *Griggs*, where the requirement of a high school diploma was instituted for entry into certain jobs, such a rule or rule change is facially neutral. If, however, we look to its effect, then it may no longer be neutral. In *Griggs* it was shown that such a requirement weeded out blacks disproportionately to the population at large. This shifts the burden of justifying the requirement onto the employer. Here it might be shown that the rule change had the effect of discriminating against blacks, because apparently none of the relatives and few of the friends of members were black. *Cf.* United States v. Local 357, IBEW, 356 F.Supp. 104, 116 (D.Nev.1973); Hunt v. Arnold, 172 F. Supp. 847, 849 (N.D.Ga.1959). This would presumably shift the burden of justifying the change by showing that the rule was actually adopted for a reasonable purpose and not for discriminatory purposes. *Cf.* Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Dean v. Ashling, 409 F.2d 754 (5th Cir. 1969).

In addition to the possible discriminatory *effect* involved in the guest rule change is the possibility of a discriminatory *intent* in adopting a facially neutral role. *See* Hawkins v. North Carolina Dental Society, 355 F.2d 718, 723–724 (4th Cir. 1966); Meredith v. Fair, 298 F.2d 696, 701–702 (5th Cir.), cert. denied, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed. 2d 66 (1962). In *Meredith*, for example, the University of Mississippi began requiring of applicants for admission, shortly after the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), recommendations from five alumni of the school which theretofore had admitted only whites. It should be needless to say that where a rule is made with discriminatory intent, that rule must fall regardless of any possible reasonable explanation that may in hindsight be proclaimed. Were the allegations submitted by plaintiffs given credence despite the denials by defendant's witnesses, discriminatory intent might be found.[13] The court below did find solely on the basis of the affidavits that the changes in the rules with respect to requiring specific approval by the directors of members' cooperating to invite a group of black children as their guests, as well as to redefining guest, were a

> direct consequence of [the] intraclub controversy occasioned by the 1968 bringing of black children to the club. There can be no doubt that the invitations extended with club approbation in 1968 occasioned the change in Rules and Regulations . . . . [I]t is indubitably the fact that the change in the Rules and Regulations was precisely intended to prevent a repetition of the group invitation of 1968.

■ The court below, however, apparently viewed the change in the rule as to groups of guests as not discriminating racially, even if racially inspired, because it treats groups of blacks and whites alike. Upon remand this view should be reexamined in the light of the realities of the situation, including the fact that the ultimate decision as to who may be invited apparently rests in the discretion of the board of directors, not in the rule itself. The court should determine whether only black children have ever sought permission of the board to be guests as a group and whether only one "group" of black children has been invited to the club. That is to say, however racially neutral the

---

13. Affidavits by plaintiffs allege, *e. g.*, that members were heard trying to figure out how to define guest so as to preclude blacks; that the present president of the club and former executive board member said, "If the majority do not want blacks— than the minority should accept that"; and that the husband of the secretary of the club said, "Who the hell are you to bring niggers into my pool?" Other allegations are even more explicit.

rule as to group invitations may appear on its face, one inquiry the court below must make is whether it was adopted to keep certain black children out, who theretofore were eligible to be guests of members, or whether the group rule had some other real basis in fact. If the former be the case, then these "unidentified, but identifiable" black children, Barrows v. Jackson, 346 U.S. at 254, 73 S.Ct. 1031, 97 L.Ed. 1586, could be found to have been personally discriminated against. A principal question for resolution is thus whether the supposedly neutral rule was nothing more in reality than a smokescreen to cover the actual intent *and* effect or whether it was factually grounded in non-racial motivations and operative non-discriminatorily.

Summary judgment for defendant vacated and cause remanded for further proceedings consistent with this opinion.