James AKIYAMA, et al., Plaintiffs,

v.

UNITED STATES JUDO
INCORPORATED, et
al., Defendants.

No. C97–0286L.

United States District Court,
W.D. Washington,
at Seattle.

Jan. 10, 2002.

Mark L. Fleming, Fleming Law Office, Seattle, WA, for Plaintiffs.

William Dirker Ehlert, Casey & Pruzan, Seattle, WA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

This action was filed in February 1997 against defendants International Judo Federation ("IJF"), United States Judo Incorporated ("USJI"), United States Judo Federation ("USJF"), United States Judo Association ("USJA"), Kenji Yamada, Harold Yamada, James Harai, and Samiko Harai. Plaintiffs James Akiyama, Leilani Akiyama, Jay Drangeid, and the U.S. Judo Training Center seek an end to defendants' requirement that they bow to inanimate objects such as portraits and tatami mats prior to judo matches. Plaintiffs assert that such practices violate their religious beliefs and discriminate against them in violation of Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a), the Washington Law Against Discrimination ("WLAD," RCW 49.60.010 *et seq.*), the Washington Consumer Protection Act ("CPA," RCW 19.86.010 *et seq.*), and the Amateur Sports Act ("ASA," 36 U.S.C. § 391(b)).

On May 13, 1997, the Court required plaintiffs to follow the administrative grievance procedure provided in the ASA and stayed the remaining claims until the administrative process was exhausted. In order to permit the individual plaintiffs to continue competing during the interim, the Court entered a preliminary injunction against defendants, prohibiting them from excluding the individual plaintiffs from judo tournaments based on their refusal to

bow outside the contest area.[1] Thereafter, plaintiffs filed an administrative complaint with USJI, the national governing body for judo under the ASA. *See* 36 U.S.C. § 391. USJI appointed a panel to hear plaintiffs' complaint and both parties presented witnesses and submitted evidence. The administrative panel found no religious discrimination or any other ASA violations and, on June 21, 1997, dismissed plaintiffs' administrative complaint. Plaintiffs appealed to the Commercial Arbitration Tribunal of the American Arbitration Association, as required by USJI procedures. Following a second evidentiary hearing, the arbitrator rejected plaintiffs' claims under the ASA.

Plaintiffs then appealed to the United States Olympic Committee ("USOC"), the corporation empowered to oversee organized amateur sports in the United States. *See* 36 U.S.C. §§ 374, 395(a)(1). Although there were significant procedural irregularities in the way plaintiffs' appeal was handled by the USOC, it ultimately concluded "that the ceremonial bowing requirements of USJI do not rise to the level of proscribed racial, religious or national origin discrimination and are not violative of the obligations of a National Governing Body." In order to exhaust their administrative remedies, plaintiffs once more initiated arbitration proceedings under 36 U.S.C. § 395(c).

On June 21–23, 2000, a three-person tribunal of the American Arbitration Association held another evidentiary hearing on plaintiffs' ASA claims. The arbitration panel made findings of fact and conclusions of law before entering a final and binding decision in favor of defendants. Defen-

dants then moved for confirmation of the arbitration award and summary judgment on the remainder of plaintiffs' claims. Defendants argued that a judo tournament and the rules associated therewith are not subject to judicial scrutiny under either Title II or WLAD. Two days before defendants filed their initial reply brief, however, the United States Supreme Court decided *PGA v. Martin,* 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001), in which the Court found that the Americans with Disabilities Act prevents discrimination against participants in a sporting activity. Although defendants' motion for confirmation of the arbitration award was granted, their motion for judgment as a matter of law was denied in order to give the parties an opportunity to evaluate and brief the impact of *Martin* on plaintiffs' Title II and WLAD claims. Defendants now seek the dismissal of all of plaintiffs' remaining claims.

## I. ISSUE PRECLUSION

■ Defendants argue that plaintiffs' civil rights claims are necessarily precluded by the existing arbitration decision and this Court's confirmation thereof. Issue preclusion arises when the issue at stake (1) is identical to the one alleged in the prior adjudication, (2) was actually litigated in the prior adjudication, and (3) was a critical and necessary part of the judgment in the prior adjudication. *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320–21 (9th Cir.1992). Defendants have the burden of showing with clarity and certainty what was determined in the prior adjudication so that the Court can "pinpoint the exact issues previously litigated." *United States v. Lasky,* 600 F.2d 765, 769

---

1. The IJF bowing regulation at issue, which has been adopted by USJI and its members, USJF and USJA, requires that contestants stop and bow in a prescribed manner prior to entering the competition area, immediately

before entering onto the tatami mat, and at their "mark" just before the start of the match. At the conclusion of the match, contestants are required to perform the same bows in reverse.

(9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).

As the briefing in this matter has made clear, the parties do not agree on the legal analysis to be applied to plaintiffs' claim under Title II. While the arbitrators made factual findings which may be binding in this litigation, defendants have offered no reason to believe that the legal conclusion that defendant USJI did not violate the Amateur Sports Act compels a similar finding under Title II or WLAD. As defendants compellingly argue elsewhere, what constitutes impermissible "discrimination" varies depending on the language of the statute at issue and the case law that has developed. In addition, the arbitrators specifically disclaimed any intent to rule upon or otherwise affect plaintiffs' Title II and WLAD claims, making it all the more necessary for defendants to show conclusively that the issues determined in arbitration are the same as those at issue in this litigation and were a necessary part of the decision on plaintiffs' Amateur Sports Act claim. The fact that all three statutes prohibit religious discrimination is simply too tenuous a basis for a finding of issue preclusion.

## II. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a

### A. Impact of *PGA v. Martin*

Defendants have abandoned their argument that Title II does not apply to sporting events, a change necessitated by the Supreme Court's analysis in *Martin.* Both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a), and Title II prohibit discrimination in places of public accommodation. In *Martin,* the Supreme Court held that the ADA's protections apply not only to the spectators at a public sporting event, but also to the participants if the competition is open to members of the general public. As part of its analysis, the Court noted:

> Our conclusion is consistent with case law in the analogous context of Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U.S.C. § 2000a *et seq.* Title II of that Act prohibits public accommodations from discriminating on the basis of race, color, religion, or national origin. § 2000a(a). In *Daniel v. Paul,* 395 U.S. 298, 306, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), applying Title II to the Lake Nixon Club in Little Rock, Arkansas, we held that the definition of a "place of exhibition or entertainment," as a public accommodation, covered participants "in some sport or activity" as well as "spectators or listeners." We find equally persuasive two lower court opinions applying Title II specifically to golfers and golf tournaments. In *Evans v. Laurel Links, Inc.,* 261 F.Supp. 474, 477 (E.D.Va.1966), a class action brought to require a commercial golf establishment to permit black golfers to play on its course, the District Court held that Title II "is not limited to spectators if the place of exhibition or entertainment provides facilities for the public to participate in the entertainment." And in *Wesley v. Savannah,* 294 F.Supp. 698 (S.D.Ga.1969), the District Court found that a private association violated Title II when it limited entry in a golf tournament on a municipal golf course to its own members but permitted all (and only) white golfers who paid the membership and entry fees to compete.

*Martin,* 121 S.Ct. at 1892 (footnotes omitted).

In the case at hand, as in *Martin,* members of the general public are welcome to test their skills and talents in preliminary tournaments designed to identify the best competitors. In such circumstances, *Martin* compels the conclusion that the event

organizers may not discriminate against potential competitors because of protected characteristics. The Supreme Court has also made clear that there is no "rules of competition" exception to the anti-discrimination laws: such rules are not immune from judicial review and may be subjected to the appropriate tests for identifying "discrimination."

Defendants argue, however, that the remainder of the *Martin* decision is irrelevant in the context of this case because its ultimate findings turn on a definition of "discrimination" which is not applicable under Title II. What constitutes "discrimination" under Title II, and how the facts of this case measure up under the applicable test, are hotly contested. Plaintiffs argue that Title II protects religious adherents from both intentional discrimination (*i.e.,* disparate treatment) and the adverse effects of facially neutral policies (*i.e.,* disparate impact). Defendants maintain that Title II encompasses only disparate treatment claims and that plaintiffs' claim, which is based solely on the disparate impact analysis, fails as a matter of law.

### B. "Discrimination" Under Title II

There is surprisingly little case law regarding the appropriate test for identifying "discrimination" under Title II. In the context of claims of racial discrimination, three courts have applied a disparate impact analysis under Title II or been willing to assume that the Act encompasses such a claim. *See Arguello v. Conoco, Inc.,* 207

F.3d 803, 813 (5th Cir.) (assuming *arguendo* that disparate impact claims are cognizable under Title), *cert. denied,* 531 U.S. 874, 121 S.Ct. 177, 148 L.Ed.2d 121 (2000); *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1340–41 (2nd Cir.1974) (if facially neutral definition of "guest" disproportionately affects minority group, burden of justifying the definition shifts to defendant); *Robinson v. Power Pizza, Inc.,* 993 F.Supp. 1462, 1464–65 (M.D.Fla. 1998) (likelihood of success on disparate impact claim shown where facially neutral policy has an adverse impact on a particular group that is not justified by business necessity). One court, however, has specifically found that the "clear language of Title II itself speaks in terms of disparate treatment (as opposed to disparate impact, for which intent is not an element)." *LaRoche v. Denny's Inc.,* 62 F.Supp.2d 1366, 1370 n. 2 (S.D.Fla.1999). In addition, both the *Olzman* and *Power Pizza* courts were faced with situations where the defendants took specific actions which, while facially neutral, had a direct, adverse, and arguably intended impact on blacks.[2] Although the courts chose to apply a disparate impact analysis, the facts clearly suggest discriminatory intent.

■ Whatever Title II's reach in cases involving racial discrimination,[3] the Court finds that, where the complaint is based on allegations of religious discrimination, intent must be an element of the claim. Unlike the class-wide characteristics which make up a particular race, the contours

---

**2.** In *Olzman,* certain members of the Lake Hills Swim Club were so incensed that a group of black children from a neighboring church had been invited to swim in the Club's pool that they redefined the word "guest" in the pool's guest policy to include only relatives or friends of a member and to exclude groups from public or private charitable or benevolent organizations. The *Power Pizza* decision was issued in the context of a motion

for preliminary injunction and involved a pizza shop's refusal to deliver pies to an African–American community because of unsupported "security" concerns.

**3.** As discussed below, the language and legislative history of the Act suggest that intent should be required for all claims brought under Title II.

and tenets of one's religious beliefs are generally non-public and are highly individualized. Virtually any restriction or regulation imposed by a public accommodation could impinge on a person's religious beliefs because such beliefs, being both malleable and subjective, are of the individual adherent's own making. Absent more, the fact that a proprietor has decided to offer his or her services to the public in a way which could impact a religious practice or belief, whether it be by conducting business only on Sundays, by failing to keep a Kosher kitchen, by failing to include fish on the menu during Lent, or by prohibiting smoking, raises no inference of discrimination or other conduct which Congress sought to censure through the enactment of Title II.

▮ The language and legislative history of Title II support the imposition of an intent requirement. Congress clearly knows how to preclude all adverse impacts on an individual's practice of religion, whether intended or unintended. *See* Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.* (invalidated by *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). In contrast, Title II precludes private and public actors from segregating or depriving individuals of services on account of their religion, a formulation which is more consistent with an intent to prevent disparate treatment than to prevent unintended adverse effects. As stated in the legislative history, the primary purpose of the Act was to remove "the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public

because of" a protected characteristic. S.Rep. No. 88–872 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2355, 2370. *See also* H.R.Rep. No. 88–914 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2393 (Title II will "make it ·possible to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public").[4] Such emotions and the overall insult to human dignity with which Congress was so clearly concerned arise in the context of intentional conduct, such as segregation and/or the denial of admission because of a patron's race or religion. The Senate Report specifically discusses the scourge of "differential treatment" and "differentiated services," both of which involve intent. S.Rep. No. 88–872 (1964), *reprinted in* 1964 U.S.C.C.A.N. at 2369. In fact, the only mention of facially neutral policies with unintended consequences recognizes that uniform practices may adversely impact religious adherents but strongly implies that such consequences do not run afoul of Title II. S.Rep. No. 88–872 (1964), *reprinted in* 1964 U.S.C.C.A.N. at 2377 (a seemingly reluctant legislator questioned whether Title II "could serve as the forerunner for legislation requiring the sale of kosher foods or fish on Friday").

The decisions in *Olzman* and *Power Pizza* are fully consistent with Congress' intent in enacting Title II, despite the fact that the court's ostensibly relied on a disparate impact analysis. Although the defendants in those cases were able to couch discriminatory motives in seemingly neutral policies, the victims received the very clear message that they were not permitted to swim in a "white" pool and were not entitled to home pizza delivery because of

---

4. Even more poignantly, the Senate Report notes the heartbreak that must accompany a parent's "inability to explain to a child that regardless of education, civility, courtesy, and morality he will be denied the right to enjoy equal treatment, even though he be a citizen of the United States and may well be called upon to lay down his life to assure this Nation continues."

the color of their skin. The courts rightly exercised their Title II power to correct such intentional and humiliating wrongs.

The only court to specifically consider a religious discrimination claim under Title II struggled with the disparate treatment/disparate impact issue facing this Court and, while not making any findings on the matter, apparently concluded that disparate treatment, not disparate impact, is the appropriate analysis under the Act. In *Boyle v. Jerome Country Club*, 883 F.Supp. 1422 (D.Idaho 1995), a golfer alleged that his club discriminated against him by scheduling golf tournaments on Sundays because the Church of Jesus Christ of Latter–Day Saints, of which he is a member, counsels against engaging in recreational activities on Sunday. The court noted that "Congress enacted Title II of the Civil Rights Act of 1964 to 'vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'" *Boyle*, 883 F.Supp. at 1428 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (quoting S.Rep. No. 88–872)). After considering the legislative history and the language of the statute, the court adopted the disparate treatment analysis of *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which, as plaintiffs point out, applies only where intentional discrimination is at issue. The court ultimately concluded that no rational trier of fact could find that defendant country club had discriminated against plaintiff on account of his religion.

### C. Proof of Adverse Impact

■ In addition, the circumstances presented in this litigation, in which each of the plaintiffs has his or her own belief system, highlight the difficulties that would arise were the Court to fashion a disparate impact claim for religious discrimination under Title II. The essence of a disparate impact claim is that facially neutral requirements or limitations adversely affect a protected group. Plaintiffs have assumed that because religion is a uniquely personal thing with every adherent free to make his or her own interpretation of what is holy and what is profane, the relevant "group" or "class" upon which a disparate impact analysis should focus consists of a single believer. Thus, any imposition on an individual's professed religious beliefs would constitute a 100% impact rate and prove disparate impact.

■ Identifying the relevant "group" or "class" in religious discrimination cases will, in many cases, be dispositive. For example, if plaintiff Drangeid is considered a Christian, there are hundreds-of-thousands of judo competitors with similar belief systems who are not adversely impacted by defendants' bowing requirement. A disparate impact claim brought by plaintiff Drangeid would, therefore, fail at the initial hurdle. The same is true if plaintiff Drangeid is considered a Lutheran. If, however, plaintiff Drangeid is considered a Christian/Lutheran who interprets the Bible to preclude bowing to inanimate objects, he may be able to show that defendants' bowing regulation discriminates against him, as the only member of this specially-defined class. These practical difficulties in identifying a protected class and determining whether there has been a statistically significant adverse impact are simply another reason to require a showing of intentional discrimination under Title II.[5]

---

**5.** The religious discrimination claims brought by plaintiffs Leilani Akiyama and the U.S. Judo Training Center are also defective in that, regardless of whether they are analyzed

■ Having considered the language of Title II, the relevant case law, and the legislative history, the Court finds that there is no claim under Title II where a proprietor or event organizer has set up facially neutral regulations governing the provision of its services, with no indication of discriminatory motive or intent. Absent some evidence that the regulation was aimed at a particular religious belief and/or that the proprietor adopted the regulation as a pretext for intentional discrimination on the basis of religion, Title II is not implicated.[6]

### D. Legitimate, Non–Discriminatory Justification

■ Even if the Court were to assume that Title II encompasses a disparate impact claim and that plaintiffs could establish an adverse effect on a protected group, defendants have met their burden of establishing a legitimate, non-discriminatory justification for the bowing requirement which bears a manifest relationship to their objectives. *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 996–99, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Although disparaged by plaintiffs, the arbitration panel found defendants' interests to be as follows:

U.S.J.I. did not make its decision to adopt the IJF Contest Rules, which include the mandatory bowing protocol . . ., because it intended to discriminate against anyone based on religion, national origin, race, or any of the other factors referenced in 36 U.S.C. § 220522(a)(8). U.S.J.I. made that decision because it reasonably believed and intended that adoption of those rules would promote the following useful, legitimate and non-discriminatory purposes:

A) Promoting the fair and safe start of matches, particularly where participants and officials may not all speak the same language;

B) Reflecting, highlighting and preserving the etiquette and traditions of judo;

C) Promoting the dignity and unique identity of the sport, which U.S.J.I. regards as distinct from "wrestling;"

D) Promoting the effective presentation of the sport to spectators attending matches in person as well as those viewing matches on television or by similar visual presentation;

E) Enhancing the ability of U.S. amateur athletes to compete effectively and

under a disparate treatment or a disparate impact standard, the objections of these plaintiffs are not religious in nature. As found by the arbitration panel after a full evidentiary hearing, plaintiff Leilani Akiyama is not a member of any particular religion, does not adhere to any particular religious faith, and was unable to identify any religious belief held by her which the bowing requirement offends. Rather, plaintiff Leilani Akiyama's firmly stated objection to bowing reflects her parents' objections, all of which are culturally based and none of which involves an adverse impact on a religious belief. Arbitration Award at 7. The U.S. Judo Training Center, as a corporation, is completely non-denominational and has no religious beliefs. Because there is no indication that the Center is being discriminated against because of the religion

of its principle(s), it cannot maintain a claim for religious discrimination.

6. By way of example, if a restauranteur's facially neutral prohibition against hats were shown to be a surrogate for a rule excluding Sikhs, Hasidic Jews, and/or Muslims, a disparate treatment claim under Title II would be appropriate. In determining whether such a claim should go to the jury, the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting analysis would guide the Court in its attempts to root out discriminatory policies while permitting business owners to regulate the types and manner of services offered based on legitimate, non-discriminatory considerations.

competitively in Olympic and other international competitions;

F) Enhancing the ability of U.S.O.C. and U.S.J.I. to perform their statutory duty under 36 U.S.C. § 22503(4) to secure for the United States the most competent amateur representation possible for Olympic and other international competitions; and

G) Assuring uniform and consistent administration of one set of rules that are applied in the same way to all contestants at U.S.J.I.—sanctioned tournaments.

These are the true and actual reasons for U.S.J.I.'s decision to adopt the IJF Contest Rules, are sincerely and reasonably held by U.S.J.I., and constitute legitimate, non-discriminatory reasons for U.S.J.I.'s decisions and for the rules themselves.

Arbitration Award Finding of Fact No. 28 (dated 8/17/00). While the aesthetic considerations associated with the pre- and post-match bowing are not related to the competition itself and are only tangentially related to defendants' formal objective of promoting the sport of judo, defendants' collective ability to generate legitimate representatives of the United States in international competition is one of their primary purposes and is clearly furthered by the mandatory bowing requirement. A ruling abolishing the bowing ritual in this country would have no force over international organizations who are not parties to this litigation or in international competitions such as the Olympics and World Championships. Thus, defendants have, as a matter of law, justified the mandatory bowing requirement and overcome any inference of discrimination that could possibly have arisen from the fact that the requirement adversely, although unintentionally, impacts plaintiffs' religious practices.

### III. WASHINGTON LAW AGAINST DISCRIMINATION, RCW 49.60.030(1)(b)

 Washington courts look to federal decisions when construing state statutes which have the same purpose as their federal counterparts. *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wash.2d 102, 118, 720 P.2d 793 (1986). While the federal case law on the proper definition of religious "discrimination" under Title II is sparse, there is no precedent on this issue under the state anti-discrimination law. For purposes of this motion, the Court will assume, without deciding, that the Washington Law Against Discrimination is broad enough to encompass a disparate impact claim in the context of religious discrimination, but finds that such a claim fails in light of defendants' legitimate, non-discriminatory justifications for the bowing requirement.

### IV. CLAIM UNDER WASHINGTON LAW AGAINST DISCRIMINATION, RCW 49.60.030(1)(f)

RCW 49.60.030(1)(f) provides in relevant part:

The right to be free from discrimination because of ... creed ... is recognized as and declared to be a civil right. This right shall include, but not be limited to:

. . . . .

(f) The right to engage in commerce free from any discriminatory boycotts or blacklists. Discriminatory boycotts or blacklists for purposes of this section shall be defined as the formation or execution of any express or implied agreement, understanding, policy or contractual arrangement for economic benefit between any persons which is not specifically authorized by the laws of the United States and which is required or imposed, either directly or indirectly, overtly or covertly, by a foreign govern-

ment or foreign person in order to restrict, condition, prohibit, or interfere with or in order to exclude any person or persons from any business relationship on the basis of … creed ….

The individual plaintiffs, James Akiyama, Leilani Akiyama, and Jay Drangeid, are not engaged in "commerce" as required by the plain language of the statute. Plaintiff U.S. Judo Training Center, which the Court will assume is engaged in commerce, has failed to offer any evidence that defendants' mandatory bowing requirement is a "policy … created for economic benefit between any persons" or that the Training Center had or hoped to have any type of "business relationship" with defendants from which it was excluded. The Court finds that plaintiffs' discriminatory boycott and blacklist claims fail as a matter of law.

## V. CONSUMER PROTECTION ACT, RCW 19.86.010, *et seq.*

Defendants argue, without response from plaintiffs, that the CPA claim is based solely on the contention that a violation of the WLAD is a *per se* violation of the CPA. Because the Court finds no violation of the WLAD, plaintiffs' CPA claim must fail.

## VI. PRELIMINARY INJUNCTION

Having determined that plaintiffs cannot prevail on their claims, preliminary injunctive relief is no longer appropriate.

For all of the foregoing reasons, defendants' additional motion for summary judgment on plaintiffs' Title II, WLAD, and CPA claims is GRANTED. The preliminary injunction entered on May 13, 1997, is hereby dissolved.