James YATES, Plaintiff,

v.

**HAGERSTOWN LODGE NO. 212 LOYAL ORDER OF MOOSE;**

**Moose International;**

and

**Maurice Jenkins, Defendants.**

Civ. No. N–94–2308.

United States District Court, D. Maryland.

Jan. 9, 1995.

William Alden McDaniel, Jr., Baltimore, MD, for plaintiff.

Stephen M. Silvestri, Margaret A. Jacobsen, Miles & Stockbridge, Jeffrey P. Ayres, Valerie Floyd Portner, Venable, Baetjer & Howard, Richard C. Burch, Mudd, Harrison & Burch, and Andrew Janquitto, Baltimore, MD, for defendants.

## MEMORANDUM

NORTHROP, Senior District Judge.

Pending before this Court for resolution are motions by Defendants Mr. David Jenkins, Hagerstown Lodge No. 212 ("the Lodge"), and Moose International, Inc. ("Moose International"), to dismiss Plaintiff Mr. James Yates' six-count Complaint. The Complaint alleges violations of the Civil Rights Act of 1964 under 42 U.S.C. §§ 1981, 1982, and 1985(3), and seeks compensatory and injunctive relief. Yates has opposed Defendants' motions and Defendants have submitted replies thereto. Upon consideration of the pleadings and papers, this Court finds no hearing to be necessary at this time. Local Rule 105.6 (D.Md.1992, as amended 1994). For the reasons stated herein, the motions to dismiss will be denied in part and granted in part.

### I. *Facts*

The following facts have been extracted from Plaintiff's 232–paragraph Complaint. They detail the relevant chronology of events surrounding Yates' involvement with the Defendants and will serve as the basis for this opinion. A careful summary, therefore, is necessary.

Lodge 212 is a Maryland corporation located in Hagerstown, Maryland. It owns a large social and dining establishment used to conduct meetings and hold social and business functions. According to the Complaint, the Lodge runs its affairs in close cooperation with Moose International, a foreign corporation which charters and monitors the activities of various Moose lodges, including the Lodge.

Yates alleges that, in the instant case, Moose International exerted control over the Lodge's activities. He states that the Lodge operated pursuant to a charter granted to it by Moose International, and that it determined its membership and non-members policies subject to the direction of Moose International. Moose International appointed the trustees, administrator, and governor responsible for operations at the Lodge. These officials enforced all policies of the Lodge.

Moose International appointed Jenkins, a white male, as governor of the Lodge.[1] Moose International also appointed Mr. David Krueger, a white male, as the administrator of the Lodge. The board of trustees who served during the times relevant to the allegations of the Complaint also consisted entirely of white males.

The Complaint avers that in return for payment of dues and the observance of certain rules, a member obtained: the use of bars, dining areas, and recreational facilities; participation in educational, charitable, social, and community activities; and eligibility for death benefits and for residence in retirement communities operated by Moose International.[2]

By joining the Lodge, one also became a member of Moose International and, as a result, was entitled to certain privileges and benefits available at other Moose lodges around the world. A percentage of the dues each member paid to the Lodge was in turn paid to Moose International.

The Lodge's rules forbade non-members from using the facilities except by a guest who was considering membership and who wished temporarily to view and use the facilities. A host member was required to accompany the guest at all times, and the guest was required to wear a guest badge. There was no requirement, however, that the guest fill out a membership application or pay an application fee prior to touring and using the facilities.

According to the Complaint, the Lodge had a practice of admitting non-members into the facilities without guest badges, allowing them to use the facilities, including members-only areas, and of allowing them to attend all functions at the Lodge, including members-only functions. Additionally, the Complaint avers that the Lodge had a policy of not permitting blacks to become members or to use the facilities, a policy of which Moose International was aware.[3]

In 1993 Yates, a black male, became interested in joining the Lodge through his friend, Mr. Donald Edwards. Edwards at that time had been a member of the Lodge for approximately fifteen years. Edwards also worked part-time as a doorman at the Lodge and during his years as a member and employee had never experienced any problems at the Lodge.

Yates states that he wished to join the organization because the Lodge engaged in numerous charitable and social activities in Hagerstown. Lodge and Moose International membership criteria were: (1) that the person seeking membership be an adult male (2) without a criminal record and (3) loyal to the United States. Yates avers that he met these requirements.

The Complaint asserts that on December 24, 1993, at approximately 3:00 p.m., Edwards and Yates arrived at the Lodge, whereupon Edwards presented his membership card to the doorman, signed his name to the register book, and wrote down the lodge number, Yates' name, and the notation "guest" next to Yates' name. He filled out a guest badge for Yates and affixed it to Yates' jacket.

The pair then walked into the social quarters of the facilities where they ordered a drink. While Edwards and Yates made their way to the pool room in the rear of the facilities, Jenkins approached them and asked Yates for his membership card. Yates

---

**1.** As governor of the Lodge, Jenkins had been entrusted with the general oversight of the Lodge's operations and with enforcement of its governing rules and policies, including those relating to touring and use of the facilities by applicants and those governing membership.

**2.** According to the Complaint, during the period at issue the Lodge had approximately 7,500 members. None of those members was black nor had there ever been a black member.

**3.** These alleged discriminatory practices led to a federal suit against the Lodge which eventually

was settled. *See Davis v. Hagerstown Loyal Order of Moose,* Civil No. HAR 92–3323 (D.Md.1992).

During pendency of the suit, Moose International suspended the charter of the Lodge for thirty days on the grounds that the Lodge had allowed non-member use of the facilities. After the reinstatement of its charter, however, the Lodge continued to permit non-members to use its facilities, a fact alleged to have been known to Moose International.

responded that he was a guest of Edwards and showed Jenkins his guest badge.

Jenkins' alleged response was that Yates had "to go." While speaking to Yates, Jenkins pointed and shook his finger and Yates noticed that Jenkins' demeanor had drawn attention to him. Yates states that Jenkins' voice was so loud that persons on the other side of the social quarters turned to watch Jenkins' confrontation with him.

The Complaint recounts that Edwards then asked Jenkins why Yates had to leave, to which Jenkins replied that the Lodge did not allow any guests inside the facilities and that only prospective members could come into the facilities. After being told that Yates was a prospective member, however, Jenkins asked Edwards if Yates had filled out a membership application and had paid his enrollment fee. Jenkins told Edwards that Yates had to leave, and that the only way Yates and Edwards could stay was if Yates paid his enrollment fee. Jenkins then walked off.[4]

Yates and Edwards then approached Krueger and informed him of what had just occurred. Krueger advised them that Yates could look around the facilities without first filling out an application or paying an enrollment fee. Nevertheless, Edwards completed a membership application for Yates and paid the required fee.[5]

According to the Complaint, Yates and Edwards then went to see the ballroom where a members-only function had ended or was just ending. Upon entering, Jenkins yelled out to Yates that he was to leave immediately. Edwards replied that he was showing Yates the room and pointed out that the members-only function had ended and that few people remained in the ballroom. Jenkins would not yield.

Yates, Edwards, and Jenkins brought their dispute to Krueger's office where Jenkins again loudly demanded that Edwards and Yates leave. He allegedly told Krueger that "this shit's got to stop," accused Edwards of failing to follow the rules regarding guests, and denied that a member could bring a guest for a tour of the facilities.

In response, Edwards noted that the rules allowed a member to show the premises and that he had seen many guests in the facilities during his fifteen years as a member. He told Jenkins that he had seen members, including Jenkins, gain admittance to the facilities without displaying their membership cards, a fact he was particularly familiar with due to his occasional employment as a doorman. Jenkins again denied these assertions and stated that he would "have" Edwards' membership in the Lodge "for this." Edwards and Yates then left the facilities.

The Complaint states that at no time when Edwards and Yates were in the facilities on December 24, 1993, did either of them see any other black individuals. They claim to have seen, however, at least three white non-members, none of whom had filled out a membership application, paid an enrollment fee, or complied with any other requirements before entering the premises.[6]

During his tenure as a doorman, Edwards had also seen many non-members enter the facilities on other occasions, a majority of whom had not filled out an application, paid the enrollment fee, or complied with any

---

4. Throughout this conversation, Yates claims that Jenkins' tone of voice was hostile, belligerent, abusive, loud, and insulting and that his actions and words were embarrassing, humiliating, and distressing.

5. After filling out the membership application, Edwards handed it and the $20 application fee to Krueger. Krueger gave Edwards back a portion of the application for Yates to retain as a receipt. The receipt bore the words "Moose International" in bold letters and listed several benefits of membership, including complete welfare, education and training for dependent children of members, and admission to an old age home in Florida. The receipt referred to other privileges

of membership, such as lasting friendships and valuable contacts, sports programs, and social activities. According to the Complaint, the receipt emphasized that participation in the privileges depended upon completion of the membership application. The receipt also indicated that a portion of lodge dues would also provide for the operation of Moose International.

6. A week after the incident, on December 31, 1993, Edwards, while working as a doorman, again saw persons at the Lodge wearing guest stickers in the ballroom at a members-only function. Each of these persons was white.

other ostensible requirements. Likewise, none of the white non-members who toured or used the facilities without paying an enrollment fee or filling out an application had ever been subjected to abuse or harassment of any kind.

Yates alleges that on December 31, 1993, Edwards told Krueger that he wanted to file a formal complaint regarding Jenkins' behavior on December 24, 1993. Krueger stated that he would take care of the matter and asked to meet with Edwards at Edwards' home on January 10, 1994, for further discussion.[7]

On January 6, 1994, Edwards received a letter dated December 31, 1993, from the Lodge informing him that he was temporarily suspended from the social quarters of the Lodge. After receiving the letter, Edwards telephoned Krueger and was informed that he had been suspended due to his argument with Jenkins. Because the board wanted to fire Edwards from his position as doorman, Krueger advised him to attend the board meeting set for January 12, 1994, where he could request reinstatement to the social quarters.

On January 12, 1994, Edwards attended the meeting and presented a formal written complaint against Jenkins which he read aloud. In reply, Jenkins told Edwards that he was indefinitely suspended from all privileges and ordered him to leave the meeting immediately.

On January 13, 1994, Krueger telephoned Edwards and explained that he had spoken with representatives of Moose International. Krueger told Edwards that Moose International had reinstated Edwards as a full member of the Lodge and of Moose International. Krueger also informed Edwards that his formal complaint against Jenkins would be handled at the next board meeting.

On January 15, 1994, Yates and Edwards went to the Lodge for Yates' prospective member interview. The interview was conducted by Mr. Richard Showe and went smoothly. Showe described for Yates the Lodge's facilities and the benefits of membership in the Lodge, including those benefits provided by Moose International. Showe specifically told Yates about the Moose International retirement center in Florida and the benefits available there, as well as benefits made available by Moose International for Yates' children.[8]

At the conclusion of the interview, the vote on Yates' application was scheduled for January 19, 1994. On January 18, 1994, Krueger telephoned Edwards and explained that Moose International had decided to postpone the vote until February 16, 1994, when representatives of Moose International could speak with Lodge members. On February 14, 15, and 16, 1994, three representatives of Moose International, all white males, met with members, officers, and directors of the Lodge to discuss Yates' application and Edwards' complaint against Jenkins.[9]

Present at the February 16, 1994, meeting were the three representatives from Moose International, Krueger, Jenkins, and approximately ninety other members of the Lodge. Everyone there was a white male and Jenkins presided. During the meeting, the Moose International representatives announced that proper voting practices should be followed and added that it could not prescribe what the procedures would be. The representatives also explained that the Lodge could not exclude anyone on the basis of race. Prior to that meeting, standard voting procedure was to read a slate of prospective applicants' names aloud and vote on it with a show of hands.

A slate of fifteen prospective members, all of whom were white males with the exception of Yates, was then presented for a vote. After the slate was read, a vote by show of hands was taken. The slate was rejected.

---

7. The meeting took place as planned.

8. Yates indicates that Showe gave him no reason to believe that his membership application would be rejected, nor did Showe state or imply that he failed to meet the criteria for membership in the Lodge and Moose International.

9. On February 15, 1994, Edwards received a telephone call threatening him with bodily harm if Yates was accepted as a member of the Lodge.

Yates claims that Mr. Glenn Kelso, a white male member of the Lodge, then asked that a secret ballot be taken, stating: "We all know why we are here. We're voting on one man and one man only—James Yates. Everyone here knows the name James Yates." In response, several of the members exclaimed: "We don't need no blacks in here. That's right. We know the nigger's name. We don't need their kind in here." The Complaint avers that after each statement, other members voiced agreement with the racist statements. Neither Krueger, Jenkins, nor any of the three representatives of Moose International spoke out against the comments or admonished the membership for the remarks.

Another member suggested that a secret ballot be held for each prospective member individually, and Kelso added that they conduct a secret ballot on Yates' name only, stating that "we all know why we're here." Kelso suggested that a vote by show of hands be taken on the remaining applicants as a group.

At that point, one of the representatives of Moose International stood up and read its voting bylaws. The representative noted that the bylaws of Moose International did not specify any particular voting procedure and that it was up to each lodge to determine how to proceed with voting on membership.

The Complaint reiterates that, despite past practice, neither Jenkins, Krueger, nor any of the three representatives of Moose International questioned in any way this deviation from customary voting practices. Indeed, Yates states that the use of the secret ballot for Yates only was encouraged and approved.

After some further discussion, Jenkins declared that a secret ballot would be held on the application of Yates only, followed by a show of hands vote for the other applicants as a group. Jenkins then read aloud Yates' name and the name of his sponsor, Edwards. Edwards stood up and asked Jenkins if the investigating committee of the Lodge had found any reason to deny Yates membership in the Lodge. Jenkins replied that none had been found.

Paper ballots with the words "No" and "Yes" printed on them were passed out to the members who then voted secretly on Yates' application. After the vote, the ballots were collected and taken to Jenkins who, with Mr. Richard Churchey and one of the Moose International representatives, counted them. After a recount, Jenkins announced that Yates had been rejected, upon which many members clapped and expressed their agreement with the results. A vote by show of hands was then taken on the remaining slate of prospective members. All members present except one voted affirmatively to accept the slate.

The Complaint states that, after the vote, a representative of Moose International informed the members that they had just "opened up a can of worms" by denying membership to a black man. The representative stated that the Lodge already had one lawsuit alleging racial bias pending against it and that the Lodge was in financial trouble. Edwards then was informed that he had been laid-off and not fired from his position as a doorman. At the same time, several members of the Lodge spoke to Edwards and asked him which member had attempted to get "a nigger" admitted to the Lodge.

## II. *Legal Standard*

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(6) allows a claim to be dismissed if it fails to state grounds upon which relief can be granted. The purpose of a motion under Rule 12(b)(6) is to test the sufficiency of the statement of the claim. *Chertkof v. Mayor & City Council of Baltimore*, 497 F.Supp. 1252, 1258 (D.Md.1980). The applicable standard is that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Faulkner Advertising Assoc. v. Nissan Motor Corp.*, 905 F.2d 769, 771–72 (4th Cir.1990); *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). For the purposes of ruling on a

motion under Rule 12(b)(6), the Court must construe a complaint liberally and in the light most favorable to the non-moving party, and it must accept all well-pleaded allegations contained therein as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158 (4th Cir.1990).[10]

### III. *Section 1981 Claim*

Count i of Yates' complaint generally states an action against Jenkins, the Lodge, and Moose International under 42 U.S.C. § 1981(a).[11] Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts * * * as is enjoyed by white citizens * * *.

Section 1981(b) defines the phrase "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Yates predicates his § 1981 claim on the Defendants' (1) denial of membership [12] and (2) refusal to make a contract with him to tour and use the Lodge facilities as a prospective member.

### A. *Defendant Jenkins*

Jenkins' motion to dismiss is premised on three points. He states that Yates' Com-

plaint: (1) fails to allege the requisite discriminatory intent on the basis of race; (2) fails to show that, as governor of the Lodge, he was in any way personally involved in the discriminatory acts against Yates; and (3) fails to show that his actions in any way caused or contributed to the denial of Yates' application.

#### 1. *Discriminatory Intent*

■ Jenkins maintains that the Complaint lacks averments describing his intentional discrimination either in denying Yates the use of the facilities as a prospective member or in the consideration of his membership application.[13] He also maintains that any allegations that he "harassed, intimidated, and humiliated" Yates while he toured the facilities do not amount to a deprivation of the right to make or enforce a contract.[14] The Court rejects both arguments.

#### a. *Use and Enjoyment*

The Court need not address at length the merits of Jenkins' contention that his actions merely amounted to an interference with Yates' use and enjoyment of the facilities and therefore did not constitute a deprivation of contractual rights under § 1981. Indeed, the Complaint alleges that after he had paid the $20 membership enrollment fee, thereby purchasing the right to tour the facilities, Yates was not permitted to complete the Lodge

---

**10.** Jenkins has asked that his motion to dismiss be considered, in the alternative, as one for summary judgment pursuant to Fed.R.Civ.P. 12(c). This Court declines to do so at this time and notes that the matters outside the pleadings have not been proffered in accordance with Rule 56(e).

**11.** The Lodge has not moved for dismissal of Mr. Yates' § 1981 claim.

**12.** Yates' allegations specifically state that membership in the Lodge constituted a contractual arrangement whereby:

in return for payment of dues and the observance of certain rules by a member, Lodge 212 and Moose International provided: use of the facilities; use of bars and dining areas; use of recreational facilities; participation in various educational, charitable, social, community activities; eligibility for residence in retirement communities operated by Moose International;

eligibility for death benefits; and other activities, benefits, and entitlement available only to members of Lodge 212 or other lodges chartered by Moose International.
Complaint at ¶ 27.

**13.** A claim under Section 1981 requires evidence of "purposeful discrimination." *General Building Contractors Ass'n, Inc. v. P.A.,* 458 U.S. 375, 381, 102 S.Ct. 3141, 3145, 73 L.Ed.2d 835 (1981).

**14.** Jenkins argues that Yates' allegations more properly are within the ambit of § 203 of Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a–2(b). Unlike § 1981, which he claims guards against the deprivation of civil rights, § 203 was designed to prevent interference with civil rights. Because Yates' action is brought pursuant to § 1981, Jenkins asserts that a showing of interference is insufficient to state a cause of action under § 1981.

tour [15] and was harassed repeatedly by Jenkins. As alleged, the facts indicate that he did not receive full touring privileges as consideration for his payment of the fee.

Likewise, Jenkins' alleged harassment of Yates supports the position that Yates was deprived of a benefit of the tour-of-facilities contract, namely, the right to inspect the premises without being disturbed. *See* 42 U.S.C. § 1981(b). Absent authority to the contrary, this Court finds unavailing Jenkins' contention that his harassment did not constitute the kind of deprivation necessary to state a cause of action under § 1981.

As for evidence that Jenkins' actions were purposefully discriminatory, the Complaint offers a plethora of examples of racially motivated conduct:

1. generally, that Jenkins intentionally denied Yates the right to use the Lodge facilities as a guest and prospective member;

2. that, unlike white guests and prospective members, Yates was required to fill out forms and pay fees to use the facilities;

3. that Jenkins personally harassed and humiliated Yates;

4. that Yates' sponsor was suspended and brought up on charges by Jenkins; and

5. that Jenkins failed to speak out against racial slurs uttered during the member vote, authorized the deviation from past voting procedure, participated in the secret ballot procedure, and acceded to Moose International's statements that the Lodge could vote as it wished.

This conduct, as alleged, both circumstantially and directly evidences discriminatory intent. *See Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266–67, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1976).

Finally, the Court is not impressed with Jenkins' protestations that Yates, for some three hours, allegedly was able to sit at the bar and play pool undisturbed. *See* Jenkins' Motion to Dismiss at 2 n. 1. Civil rights are founded not on a relativist calculus of dis-

criminatory behavior but on the principle that deprivations of rights resulting from racial animus are unlawful. That Yates should have been able to enjoy a few drinks without incident during the course of his visit is, with respect to any previous or subsequent discriminatory treatment, wholly immaterial, particularly for pleading purposes.

### b. *Denial of Membership*

With respect to the denial of membership, the Complaint supports the claim that Jenkins' actions were aimed at preventing Yates from joining the Lodge. When considered from beginning to end, Jenkins' conduct, if proven, describes what amount to a campaign to undercut Yates' chances of joining the Lodge. As governor of the Lodge, Jenkins exerted influence and control both over the treatment of prospective members and over the processing of their applications. Taken as a whole, then, and considered apart from the question of causation, sufficient facts relating to discriminatory intent have been pled to establish the presence of racial animus with regard to the rejection of Yates' application. *See Arlington Heights, supra; Little v. United States,* 489 F.Supp. 1012, 1023 (C.D.Ill.1980), *aff'd,* 645 F.2d 77 (7th Cir.1981).

### 2. *Personal Involvement*

Likewise, Jenkins' argument that the Complaint insufficiently pleads his personal involvement in denying the instant membership application rings rather hollow. The thrust of Jenkins' position is that he was not involved in creating the Lodge's " 'policy of not allowing African–Americans to become members or to use the facilities,' " Jenkins Reply at 8, *quoting* Complaint at ¶ 42, and, therefore, can not be held accountable for its enforcement, absent evidence of his racial animus. Jenkins further states that he can not be impugned merely because of his status as governor of the Lodge.

■ This Court has found that the numerous examples of Jenkins' own racial bias against Yates create an inference of his in-

---

**15.** The Complaint alleges that although it was customary for white prospective members to tour any Lodge room, even if there was a member function in one of them, Yates was asked by Jenkins to leave a ballroom where a member function had just ended or was ending.

tent to refuse him membership. Based on his prior acts against Yates and Edwards, Jenkins' arguably passive conduct at the vote can be read as having been more than merely neutral. Therefore, Jenkins' position that "doing exactly what he was supposed to do as governor" renders him unaccountable for his actions is somewhat disingenuous since the lawfulness of that conduct is one of the central questions of this litigation. Jenkins Reply at 8–9. In other words, where a custom, practice, or rule is used in a discriminatory fashion, those who participate in their application, or in a discriminatory deviation therefrom, may be liable. *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1144–46 (4th Cir.1975) (where a corporate officer "voluntarily and intentionally cause[s] the corporation to act" he may be held liable for the resulting wrong); *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799 (1972).

### 3. Causation

■ Last, Jenkins argues that count i has failed to allege facts of causation with respect to the denial of Yates' membership application. Quoting *Tedrow,* 265 Md. at 551, 290 A.2d 799, Jenkins states that the Complaint does not show how his conduct "contributed to, or helped to bring about," the rejection of Yates' application. Jenkins' Motion to Dismiss at 11. In particular, Jenkins maintains that he could not exert "unilateral control" at the vote, "could not accept Yates' membership application or confer membership status on Yates," or "enter into the contract * * * or confer the property right." *Id.; see Tillman,* 517 F.2d at 1146.

This Court notes *Tedrow's* review of corporate officer liability:

> The general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body.

265 Md. at 550, 290 A.2d 799. When the numerous allegations of Jenkins' racially prejudicial acts are combined with those re-

lating to his fomenting of negative racial sentiment and enabling deviations from membership policy and voting procedures, this Court finds the Complaint accurately to describe a mode of conduct which "inspire[d] or participate[d]" in the Lodge's discriminatory actions. *Id.*

### B. Defendant Moose International

Moose International seeks to dismiss Yates' Complaint on two grounds: (1) that it fails to state with particularity that Moose International intentionally discriminated against him, and (2) that vicarious liability can not be imposed on Moose International for the unlawful acts of Jenkins or the Lodge.

### 1. Discriminatory Intent

■ With respect the Moose International's first contention, this Court finds that Yates has alleged sufficient facts to sustain a claim that Moose International intentionally discriminated against him. Indeed, the examples of discriminatory intent in the Complaint are manifold:

1. knowledge of the Lodge's racially prejudicial guest policy;
2. knowledge that non-members were allowed by the Lodge to use the facilities;
3. knowledge of specific incidents of racial discrimination by the Lodge;
4. postponement of the vote on Yates' application;
5. meeting with Jenkins and others prior to the vote on Yates' application;
6. responding to racist remarks uttered at the vote by instructing Lodge that it could not dictate its voting procedures;[16]
7. failing to object to a clearly discriminatory voting procedure;
8. assisting in verifying the results of the vote;
9. failing to offer membership to Yates; and
10. failing to interfere with Jenkins' temporary termination of Edwards.

---

16. As alleged in the Complaint, Moose International's representatives indicated only prior to commencement of the meeting that an applicant

could not be excluded on the basis of race alone. No such statement was made after the alleged racist remarks were uttered.

Moose International takes issue with Yates' portrayal of its actions as exhibiting discriminatory intent. However, Yates' claim is adequately substantiated with specific facts from which racial animus may be inferred, and this Court can not agree with Moose International's characterization of the allegations as ones that are merely conclusory. At the very least, Yates has set forth sufficient facts which, if proven, would create an inference that Moose International either intentionally discriminated against blacks—and/or Yates—or followed a policy of non-interference with race-related matters within the Lodge such as to create an inference of racial animus. Indeed, rather than demanding that the Lodge and Jenkins cease their patently discriminatory conduct, Moose International appears to have perfunctorily aired general propositions about the unacceptability of racial bias. In light of the Lodge's prior involvement in charges of discrimination and its alleged passivity with respect to pervasive and ongoing discriminatory practices, this Court has reason to cast serious doubt on Moose International's commitment to racial equality. *Cf. Goodman v. Lukens Steel Co.*, 482 U.S. 656, 665–66 n. 11, 666–69, 107 S.Ct. 2617, 2623–24 n. 11, 2624–25, 96 L.Ed.2d 572 (1987).

### 2. *Vicarious Liability*

■ To the extent that Yates is unable to show that Moose International was in an agency relationship with the Lodge, with knowledge of and consenting to intentionally discriminatory acts, Moose International can not be held liable under a theory of vicarious liability.[17] Applying common-law agency principles to the instant Section 1981 claim, Moose International may be found liable for the Lodge's and Jenkins' unlawful acts if, as a principal, it had knowledge of the relevant circumstances and authorized, ratified, or approved the intentional conduct. *Berger v.*

---

**17.** Vicarious liability is otherwise referred to as *respondeat superior.*

**18.** Yates urges this Court to adopt the reasoning found in cases like *Springer v. Seaman,* 821 F.2d 871, 881 (1st Cir.1987), and *Malone v. Schenk,* 638 F.Supp. 423, 425 (C.D.Ill.1985), where liability appears to have been imputed without a

*Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1430 (D.C.Cir.1988).[18]

■ This Court's conclusion is guided in part by *General Building Contractors Ass'n, Inc., v. P.A., supra,* wherein the Supreme Court assumed, without deciding, that *respondeat superior* would apply to suits based on Section 1981. Justice O'Connor's concurring opinion specifically notes that *respondeat superior* had not been applied in the case at bar because there was no evidence of an agency relationship. She noted, however:

> Once this case has been remanded to the District Court, nothing in the Court's opinion prevents the respondents from litigating the question of the employer's liability under § 1981 by attempting to prove the traditional elements of *respondeat superior.*

458 U.S. at 404, 102 S.Ct. at 3157 (O'Connor, J., concurring).

Moose International contends, *con brio,* that Yates has failed to allege facts showing that an agency relationship existed between Moose International and the Lodge and its employees. For purposes of this motion, however, Yates has carried his burden. His Complaint alleges generally: (1) that the Lodge was under the direction and control of Moose International, (2) that the Lodge operated subject to rules, regulations, and a charter established by Moose International, (3) that the Lodge's membership policies were subject to the direction and control of Moose International, and (4) that the trustees, governor, and administrator of the Lodge, responsible for the administration of those policies, were appointed by Moose International. There is no doubt that these allegations are sufficient for pleading purposes. *See Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 244 (6th Cir.1990) (summary judgment); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d at 1430–31.

---

showing that the principal necessarily knew of its agent's acts and in some manner consented to them. This strict liability approach, however, is not in line with the aim of Section 1981 to redress purposeful discrimination. *General Building Contractors,* 458 U.S. at 391, 102 S.Ct. at 3150.

Last, Moose International claims that Yates has failed to address its arguments relating to the circumstances under which international organizations will be liable for the acts of their local entities. These arguments, however, merely posit anew the agency question addressed above and, as such, are answered by the host of allegations found in the Complaint. Indeed, the Complaint contains numerous averments of fact evidencing Moose International's ostensible ratification of racially discriminatory acts which were performed neither independently of nor unbeknownst to it. For example, Moose International itself postponed the vote in Yates' case, a fact which, if true, raises the inference that it desired to keep the best possible face an otherwise discriminatory rejection of Yates' application. Moose International's involvement and participation in the vote and its failure forcefully to address anti-black sentiment, if true, may create an inference of more than mere passivity on its part. Similarly, closing down the Lodge is not, as Moose International would have it, necessarily evidence that there was "nothing more that [it] reasonably could have been expected to do" as a result of Yates' rejection. Moose International's Motion to Dismiss at 13. Yates specifically has alleged that Moose International should have attempted to exert more authority at the vote and could have taken steps to offer him membership to the Lodge. As presented by Yates, Moose International's acts and omissions, when considered in their proper context, therefore raise sufficient inferences of its active involvement in the derogation of his rights.

Accordingly, Defendants' motion to dismiss count i of the Complaint shall be denied.

## IV. Section 1982 Claim

■ The gravamen of count iii of Yates' Complaint is that the Lodge's refusal to extend him membership was in violation of his civil rights under § 1982. Section 1982 provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. In support of his contention that club membership [19] constitutes personal property within the meaning of Section 1982, Yates cites *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), *Wright v. Salisbury Club, Ltd.*, 632 F.2d 309 (4th Cir.1980), and *Sims v. Order of United Commercial Travelers of America*, 343 F.Supp. 112 (D.Mass. 1972). This Court disagrees with Yates' analysis of his authority.

In *Sullivan*,[20] the defendant was a corporation organized to operate recreational facilities for the benefit of county residents. A person holding a membership share who rented his home to another was entitled to assign his share to the lessee. Presented with facts showing that the corporation had refused, on racial grounds, to approve one such assignment, the Court interpreted the term "lease" in Section 1982 "to include an assignable membership share in recreational facilities." *Memphis v. Greene*, 451 U.S. 100, 121, 101 S.Ct. 1584, 1597, 67 L.Ed.2d 769 (1980). The Court held that the "membership was part of the lease and that the right to lease was specifically guaranteed by § 1982," *id.* n. 33, and, as such, found the lease, not the membership included in it, to

---

**19.** In his opposition to the Lodge's motion to dismiss, Yates offers additional property interests as predicates for his § 1982 claim. None, however, other than the refusal to grant him membership, was alleged in the portion of the Complaint which states the instant claim, and, accordingly, none other shall be considered here. These property rights include guest privileges and the use of Lodge facilities in exchange for an admission fee. *See Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1338 n. 10 (2d Cir. 1974); *Scott v. Young*, 421 F.2d 143, 145 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26

L.Ed.2d 91 (1970). Assuming, *arguendo*, that they had been properly and specifically alleged in support of the § 1982 claim, this Court's conclusion would not change. *See, infra*, notes 24 and 25.

**20.** Prior to *Sullivan*, the Supreme Court, in *Jones v. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), had held that the refusal to sell petitioner a home because he was black amounted to a denial of his Section 1982 rights.

be the protected property interest within the scope of § 1982.[21]

Later, in *Tillman v. Wheaton–Haven Recreation Ass'n, supra,* the Court extended its holding in *Sullivan* to cover a preference to purchase a nontransferable swim club membership.[22] In that case, a resident of a particular geographical area who applied for a swim club membership would receive the benefit of three preference criteria which the Court found conferred property rights that could not be denied on the basis of the homeowner's race. *Memphis,* 451 U.S. at 122 n. 34, 101 S.Ct. at 1597–98 n. 34. The Court concluded not that the membership itself constituted a protected property interest but that denial of the benefits of the preference system would potentially diminish the value of a home within the specified geographical zone. *Tillman,* 410 U.S. at 437, 93 S.Ct. at 1094. As such, a § 1982 claim based on refused membership would arise from a realty right:

> When an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area. The mandate of 42 U.S.C. § 1982 then operates to guarantee a non-white resident, who purchases, leases, or holds this property, the same rights as are enjoyed by a white resident.

*Id.*

The Supreme Court has not addressed further the question of whether club membership falls under the rubric of § 1982 real or personal property. Indeed, the Fourth Circuit Court of Appeals last applied the *Tillman* and *Sullivan* holdings in 1980 in a similar case involving geographical preference criteria for admission into a privately-owned club. The Appeals Court found that the club had, in practice, "linked membership to residency in a narrow geographic area * * * [and that] * * * the club [had] done a great deal to convince subdivision members that they [might] become members." *Wright v. Salisbury Club, Ltd.,* 632 F.2d at 315. Because the club's exclusion of applicants who were subdivision residents was motivated solely by race, the Fourth Circuit held that the membership-residency link was a sufficient basis for a § 1982 violation.

Yates draws this Court's attention to a footnote in *Wright* in which the Appeals Court stated that it had disposed of the § 1982 claim with the *Sullivan/Tillman* analysis because it provided the narrowest basis for decision and because the parties had cast the debate in that manner. *Wright,* 632 F.2d at 314 n. 12. The Court added, however, that:

> it is not at all clear that club membership must be connected to ownership of other property to fall within the terms of § 1982. Section 1982 includes real and personal property. In light of the broad meaning of the statutory language, club membership may in itself be real or personal property.

*Id.* (citations omitted). The Court cited, as does Yates, the holding in *Sims v. Order of United Commercial Travelers of America, supra,* in which the Massachusetts District

**21.** Yates urges this Court to consider as dispositive the Supreme Court's statement in *Sullivan* that it is "not material whether the membership share be considered realty or personal property, as § 1982 covers both." 396 U.S. at 236, 90 S.Ct. at 404. In light of later Supreme Court decisions characterizing *Sullivan,* however, this Court is not persuaded that the *Sullivan* Court intended that the membership share be considered separately from the real property interest of which it was the subject. *See Memphis v. Greene,* 451 U.S. at 121 n. 33, 101 S.Ct. at 1597 n. 33; *Tillman v. Wheaton–Haven Recreation Ass'n,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1972) ("a membership share * * * assigned by a property owner *as a part of a leasehold he was granting,* constituted a right 'to * * * lease * * * property' protected by § 1982") (emphasis added).

Justice Harlan's dissenting remarks about the ambiguity of the Court's statement in *Sullivan* are fairly illuminating in this regard:
> [E]xamination of the opinion will show that the majority has failed to explain why the membership share is *either* real *or* personal property.

*Sullivan,* 396 U.S. at 248, 90 S.Ct. at 410 (Harlan, J., dissenting). Indeed, the majority of the Court did not intend for the membership share to be either real or personal property but, rather, an interest inextricably linked to real property and, therefore, one whose absence would be actionable under § 1982.

**22.** The instant case, like *Tillman,* involves membership that is not transferable. Notably, the membership share in *Sullivan* was assignable.

Court stated that a life insurance policy was a purchaser's "investment decision whereby he purchases a promise to pay his designated beneficiary on the event of his death" and, therefore, was within the ambit of § 1982. *Id.* at 115.

Yates has advanced no persuasive argument for why this Court should adopt his view and recast the Supreme Court's holding as one providing for a far broader application than was intended. He merely restates the language from *Sullivan* cited and discussed above, *supra* note 21, and invokes that Court's additional caution against construing § 1982 narrowly.[23] That admonition, however, was styled with real property concerns in mind and, therefore, was meant to be applied within the parameters of real property related transactions. *See Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182, 1198 (D.Conn.1974). The instant case bears no relation to real property matters.

Section 1982 generally is aimed at remedying discrimination relating to property, while Section 1981 provides against the refusal to contract on the basis of race. Yates has failed to explain why, absent specific allegations that an interest in property has been denied,[24] Section 1982 should be expanded to apply to matters clearly contractual. In short, he has not offered a basis for why the overlap of §§ 1981 and 1982 might be proper in this case.[25] *See Murray v. National Broadcasting Company, Inc.,* 844 F.2d 988, 994 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988) (the existence of a protectible property interest is an essential element of a Section 1982 claim); *Gonzalez v. Southern Methodist University,* 536 F.2d 1071, 1072 (5th Cir.1976), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977).

Yates' attempt to establish a link to real property in the sense that "membership [gives] the member the right to enter upon and use the facilities owned by Lodge 212, other Moose lodges, and defendant Moose International" is conceptually unsound. Yates' Opposition to the Lodge's Motion to Dismiss at 47. Absent evidence of a nexus between club membership and some other distinct property interest, as required by *Tillman* and *Sullivan,* there is no reason to expand the reach of § 1982 and hold that membership in a club shall be considered property. *See Solomon v. Miami Woman's Club,* 359 F.Supp. 41 (S.D.Fla.1973).

Accordingly, Defendants' motion to dismiss count iii of the Complaint shall be granted as shall Defendants' motion to dismiss count iv, brought pursuant to § 1985(3), for conspiring to violate Yates' § 1982 rights. *See, e.g., Shaare Tefila Congregation v. Cobb,* 606 F.Supp. 1504, 1509 (D.Md.1985).

**23.** There, the Court stated:
> [a] narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection afforded by § 1 of the Civil Rights Act of 1866, 14 stat. 27, from which § 1982 was derived.

*Sullivan,* 396 U.S. at 237, 90 S.Ct. at 404.

**24.** Again, the lack of any such allegation in count iii, not the Complaint as a whole, is the principal defect. Even if those additional grounds were considered here, however, this Court would draw the same conclusion. Indeed, the supporting authority Yates cites warrants such a result. First, before holding that guest status would give rise to a property interest, the court in *Olzman, supra,* 495 F.2d at 1336, was careful to note that the facts of its case were similar to those in *Tillman,* particularly with regard to the existence of a membership-residence link. No such link is present in the instant case. Second, in *Scott v. Young,* 421 F.2d at 145, the Fourth Circuit's decision that the contract provision of § 1981 would apply to club admission in return for a fee

merely stated that the section should be "construed in a similar broad fashion" as § 1982.

**25.** In *Olzman,* Judge Oakes found that the "freedom of blacks to go and come as guests of a club member * * * sufficiently pertain[ed] to a condition of property" and that "[u]pon being invited by a member of the club, a black child becomes an invitee of that member with certain rights pursuant thereto." 495 F.2d at 1339. As noted above, club membership was tied to ownership of real property. *Id.* at 1336 n. 4. Therefore, the property interest which the invitees in *Olzman* claimed was directly dependent on any interest which the members owned, thereby justifying an overlap between §§ 1981 and 1982. *Cf. Walker v. Pointer,* 304 F.Supp. 56, 61–62 (N.D.Tex.1969) (freedom to "go and come" as guests is a tangible property interest related to host's leasehold); *Durham v. Red Lake Fishing & Hunting Club, Inc.,* 666 F.Supp. 954, 961 (W.D.Tex.1987) (§ 1982 leasehold interest would arise from club member's right to make improvements on lot).

## V. *Section 1985(3) Conspiracy to Violate Section 1981*

Section 1985(3) of Title 42 of the United States Code prohibits "two or more persons" from conspiring to deprive any individual of the equal protection of the law or of equal privileges and immunities under the law. In answer to Yates' claim that Defendants conspired to deprive him of his rights under § 1981, Defendants contend that Yates' Complaint fails to link them factually to one another in any such conspiracy. They further maintain that the intracorporate conspiracy doctrine shields them from any liability under Section 1985(3).

■ An action properly brought under Section 1985 requires that a plaintiff allege: (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Buschi v. Kirven,* 775 F.2d 1240, 1257 (4th Cir.1985); *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). The Fourth Circuit recognizes also, however, that a corporation can not conspire with its own agents and employees. Although this precept frequently has been discussed in the antitrust field, *see e.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953), it is also applied in cases alleging civil rights conspiracies. *Buschi,* 775 F.2d at 1251–52.[26]

■ Two exceptions to the intracorporate conspiracy doctrine are recognized. The first is where an agent has an " 'independent personal stake in achieving the corporation's illegal objective,' " *id., quoting Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,*

496 F.2d 391, 399 (4th Cir.1974), and the second where the acts of the agent or employee were unauthorized. *Id., citing Hodgin v. Jefferson,* 447 F.Supp. 804, 807 (D.Md. 1978).

■ Defendants vigorously argue that because Jenkins, the Lodge, and Moose International are the same or within the same corporate entity, the intracorporate doctrine serves as a bar to Yates' claim. They further state that because neither of the doctrine's exceptions fits the facts of this case, Yates' Section 1985(3) claim must be dismissed. Although this Court agrees that the exceptions' applicability is questionable, it is not at all clear that the intracorporate conspiracy doctrine is applicable at this time. For purposes of his conspiracy claim, Yates' identification of the Lodge and Moose International as separate actors has generated an inference that the two corporate defendants may not be considered as one. Whether or not the Lodge and Moose International are in fact one actor is not an issue fit for resolution at this juncture. Consequently, although Jenkins may be considered an officer of the Lodge, to the extent that the Complaint alleges collusive action between Moose International and him, Yates also has properly pled a conspiracy action against Jenkins.

■ Turning next to the sufficiency of the factual allegations, this Court finds no reason to dismiss Yates' claim. Neither party disputes that Section 1985(3) mandates that an agreement among defendants, at least to the extent that they all "actually shared the same conspiratorial objective or motive," must be shown for there to be a conspiracy. *LaBoy v. Zuley,* 747 F.Supp. 1284, 1296, n. 6 (N.D.Ill.1990). Yates need not, however, allege "exactly how the agreement was made—*i.e.,* * * * where and when, and with what words, the agreement was formed." *Waller v. Butkovich,* 584 F.Supp. 909, 931 (M.D.N.C.1984) (citations omitted). Rather, Yates is required only to allege an

---

**26.** The Third, Sixth, Second, and Eighth Circuits also have applied the intracorporate conspiracy doctrine to civil rights cases. *See Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 70–72 (2d Cir.1976); *Doherty v. American Motors Corp.,* 728 F.2d 334, 339–40 (6th Cir.1984); *Baker v. Stuart Broadcasting Co.,* 505 F.2d 181, 183 (8th Cir. 1974).

agreement or make averments that there was a " 'communication, consultation, cooperation, or command' from which such an agreement can be inferred." *Id., quoting Weathers v. Ebert,* 505 F.2d 514, 517 (4th. Cir.1974). Last, although he must make specific allegations connecting the defendants to the injury, Yates need not plead an overt act against each defendant since a single act by one conspirator may sustain a conspiracy claim. *Id., citing Sigler v. LeVan,* 485 F.Supp. 185, 196 (D.Md.1980); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,* 518 F.Supp. 993 (S.D.Tex.1981).

As a threshold matter, Yates has alleged the required elements identified in *Buschi, supra.* The conspiracy claim alleges: (1) that the three Defendants agreed and conspired, (2) with a motive to discriminate on the basis of race, (3) to deprive Yates of the equal protection of the laws, which (4) resulted in injury (5) as a direct and proximate result of their acts in furtherance of the conspiracy.

With respect to the Defendants' claim that Yates' factual allegations separate rather than link them in conspiratorial accord, this Court finds that Yates has pled sufficient facts to create an inference of conspiracy. *See Waller v. Butkovich,* 584 F.Supp. at 933 (the element of 'agreement' can be inferred from the defendants' alleged cooperation with each other). The claims that Moose International delayed the vote on Yates' application must be considered in context with the association's alleged passivity about the Lodge's departure from traditional voting practices.[27] Taken as a whole, these allegations, including Moose International's participation in the vote, its alleged perfunctory remarks against racial bias, and other omissions,[28] provide ample specificity about what might have amounted to concerted discrimi-

natory action by Jenkins, the Lodge, and Moose International.[29]

Accordingly, Defendants' motion to dismiss count ii of the Complaint shall be denied.

## VI. *Section 1985(3) Conspiracy to Violate the Thirteenth Amendment*

■ The Court agrees with Defendants' contention that count v of the Complaint should be dismissed. Yates claims that, although he was not enslaved, Defendants conspired to violate his rights as guaranteed under the Thirteenth Amendment of the United States Constitution. The Court finds there to be no merit to Yates' argument.

The Thirteenth Amendment gives Congress the authority, *inter alia,* to pass laws proscribing actions by states and private individuals which constitute "badges and incidents of slavery." *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 440, 88 S.Ct. 2186, 2203, 20 L.Ed.2d 1189 (1968); *Griffen v. Breckenridge,* 403 U.S. 88, 105, 91 S.Ct. 1790, 1800, 29 L.Ed.2d 338 (1971). Therefore, although "the Amendment does contain * * * words that * * * * could empower Congress to outlaw badges of slavery," a Court does not have "authority under the Thirteenth Amendment to declare new laws * * *." *Palmer v. Thompson,* 403 U.S. 217, 226–27, 91 S.Ct. 1940, 1945–46, 29 L.Ed.2d 438 (1971). In the instant case, Yates in effect is asking that this Court establish a right similar to that guaranteed by the contract principles of Section 1981 but one distinctly outside of its boundaries. Because reaching that result would "severely stretch" the words of the Thirteenth Amendment and "do violence to its history," *id.,* this Court can not let stand as a separate and independent cause of action Yates' Section 1985(3) conspiracy

---

27. Moose International's objection that voting procedures used for Yates' application were not in violation of written bylaws is somewhat specious given that questions about the lawfulness of deviating from traditional voting practices are at the heart of this case.

28. *E.g.,* failure to confer membership on Yates.

29. Indeed, these allegations indicate that the Defendants had more than "mere knowledge" of

the conspiracy, *see Peck v. United States,* 470 F.Supp. 1003, 1012 (S.D.N.Y.1979), but, rather, affirmatively advanced its goals. Likewise, the Complaint goes well beyond making general allegations that the Defendants had unspecified communications. *See Sigler v. LeVan,* 485 F.Supp. at 196–97. Rather, Yates' allegation of facts evidencing cooperation between Jenkins, the Lodge, and Moose International provide enough support for his conspiracy claim.

claim with the Thirteenth Amendment as its basis.[30]

Accordingly, Defendants' motion to dismiss count v of the Complaint shall be granted.

## VII. *Injunctive Relief*

In count vi of the Complaint, Yates seeks preliminary and permanent injunctive relief against Defendants to prohibit them from discriminating against him in the future. Although there appears to be no reason for preliminary injunctive relief,[31] this Court is persuaded that, at this time, Yates' claim satisfies the mootness exception with respect to his request for a permanent injunction.

Accordingly, Defendants' motion to dismiss count vi of the Complaint shall be denied.

## VIII. *Conclusion*

In accordance with the foregoing, the motions to dismiss of Defendants Jenkins, the Lodge, and Moose International shall be granted as to counts iii, iv, and v, and denied as to counts i, ii, and vi of the Complaint.

A separate Order shall enter.

---

**30.** In support of his position, Yates cites *Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1480 (S.D.Fla.1987), *aff'd* 865 F.2d 1272 (1988), *cert. denied,* 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), wherein the Court sought support from *Griffin v. Breckenridge, supra,* for its holding that "[a] conspiracy to violate the 13th Amendment may form the basis of a suit brought pursuant to § 1985(3)." This Court disagrees with the Florida Court's reading of *Griffin.*

**31.** No such motion is before the Court at this time.